**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GEORGIA MCCANN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 05-0364-WS-B** |
| | ) | |
| **MOBILE COUNTY PERSONNEL BOARD,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on motions for summary judgment filed by all defendants. (Docs. 34, 42).  The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 33, 38-41), and the motions are ripe for resolution.  After carefully considering the foregoing, the Court concludes that the motions for summary judgment are due to be granted in part and denied in part.

**BACKGROUND**

The plaintiff has at all relevant times been a corrections officer employed by the Mobile County Sheriff's Office.  Defendant Jack Tillman, a white male, served at all relevant times as sheriff of Mobile County.  Defendant Michael Haley, a white male, has served as warden of the Mobile County jail since April 2003.  Defendant David Turner, a white male, has served as deputy warden of the Mobile County jail since September 2003.  Defendant Melinda Bounds, a white female, served at all relevant times as a lieutenant and was, from June 2003 to September 2005, the plaintiff's supervisor.[1]

Tillman is sued only in his official capacity as the plaintiff's employer for purposes of her claims under Title VII, 42 U.S.C. §§ 1981 and 1983.  The other individual defendants are sued in both their individual and official capacities under Sections 1981 and 1983.  The Mobile County

---

[1]The complaint identifies this individual as "Melissa" Bounds, but she identifies herself as "Melinda."  (Doc. 40, Exhibit 94 at 142-43).

Personnel Board ("the Board") is sued under Sections 1981 and 1983 for injunctive relief only.

The complaint alleges that the plaintiff has experienced race discrimination and retaliation in violation of these statutes in the following respects:

- Discipline, (Doc. 1, ¶¶ 5-7, 11-13);
- Compensation, (*id*., ¶ 11);
- Lowering of service rating, (*id*., ¶ 13);
- Failure to promote, (*id*., ¶¶ 5-7, 11, 13);
- Failure to reassign or transfer, (*id*., ¶¶ 5-7, 11, 13); and
- Hostile work environment, (*id*., ¶ 8).

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and 42 U.S.C. § 2000e-5(f)(3).  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3).

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986))(footnote omitted).

The parties have submitted a large number of exhibits, some of which they have not referred to in their briefs and some of which they have referred to only in part.  There is no burden on the Court to identify unreferenced evidence supporting a party's position.[2]  Similarly,

---

[2]*E.g., Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 672 (10th Cir. 1998)("The district court has discretion to go beyond the referenced portions of these [summary judgment]

"[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). Accordingly, the Court's review is limited to those portions of the exhibits to which the parties have specifically cited. The Court's review is similarly limited to those legal arguments the parties have expressly advanced.

Because the plaintiff does not rely on direct evidence of discrimination, the shifting burden appropriate for cases resting on circumstantial evidence applies. In Title VII cases alleging discrimination, the burden is first on the plaintiff to establish a prima facie case. If she succeeds, the employer must meet its burden of producing evidence of one or more legitimate, nondiscriminatory reasons for the adverse employment action. The burden then shifts back to the plaintiff to show that the employer's proffered reasons are a mere pretext for illegal discrimination. *E.g., Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002). The same burden-shifting paradigm applies to cases alleging retaliation under Title VII. *Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).

The parties agree that "claims under § 1983 and Title VII generally have the same elements of proof and use the same analytical framework ...." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). (Doc. 33 at 8; Doc. 38 at 7). The same is true of claims under Section 1981. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

**I. Discipline.**

On July 12, 2004, a pre-disciplinary panel found the plaintiff guilty of two specifications of conduct unbecoming an officer, one specification of disorderly conduct, and one specification of violation of a lawful or reasonable regulation or order made and given by a superior officer. (Doc. 40, Exhibit 51 at 1-5). All charges and specifications arose out of an incident occurring on or about June 1, 2004 and involving the plaintiff's interaction with representatives of the Washington County sheriff's office. As a sanction, the plaintiff was suspended without pay for

---

materials, but is not required to do so."); *accord Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989); *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1139 (7th Cir. 1984); *Karlozian v. Clovis Unified School District*, 2001 WL 488880 at *1 (9th Cir. 2001); *see also* Local Rule 7.2.

ten days beginning July 18, 2004.

### A.  Race Discrimination.

Before work on June 1, 2004, the plaintiff learned that her son was in jail in Washington County.  (Doc. 40, Exhibit 93 at 20-21).  She called her sergeant, requested and received an emergency vacation day, and proceeded to the Washington County jail without changing out of her uniform.  (*Id.*; *id.*, Exhibit 94 at 122, 130).  Turner had issued a directive in November 2003 forbidding employees to wear uniforms other than at work or when traveling to and from work.  (*Id.*, Exhibit 32).  On June 4, 2004, Sheriff Wheat of Washington County wrote the Mobile County sheriff's department that the plaintiff had behaved irrationally and disrespectfully to Wheat and his deputies, including making false accusations about the deputies and how they performed their work.  (McCann Deposition, Exhibit 2).

The pre-disciplinary panel found the plaintiff guilty of wearing her uniform at the Washington County sheriff's office in violation of Turner's directive; of wearing her uniform in an attempt to influence the bonding and release of her son; and of being discourteous and irrational in her dealings with Sheriff Wheat.  (Doc. 40, Exhibit 51 at 1-3).  The plaintiff appealed to the Board, which heard testimony from a wealth of witnesses and found the plaintiff "guilty of the charges brought against her."  (*Id.* at 5-16).

The plaintiff admits that she attended to personal business while in uniform, but she denies being disrespectful to law enforcement officials in Washington County and denies having used her uniform to attain a personal goal.  She does not appear to contest that Turner issued the uniform directive, but she denies that it was properly publicized or that she was aware of its existence.  (Doc. 33 at 10-14).  The plaintiff presented evidence in support of these arguments at her pre-disciplinary hearing and before the Board, but both bodies rejected them in finding her guilty as set forth above.  The panel consisted of three officers, none of whom is alleged to have harbored a discriminatory motive.  Likewise, the Board consists of five members, none of whom is alleged to have discriminated against the plaintiff.[3]

---

[3]The evidence presented to the Board demonstrates overwhelmingly that the plaintiff was irrational and discourteous, and it strongly supports the proposition that she wore her uniform in

"To establish discrimination in discipline, ... a plaintiff must first make out a prima facie case demonstrating: 1) that he belongs to a protected class under Title VII; 2) that he was qualified for the job; and 3) that a similarly situated employee engaged in the same or similar misconduct but did not receive similar discipline." *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *accord Lathem v. Department of Children and Youth Services*, 172 F.3d 786, 792 (11th Cir. 1999). The plaintiff concedes her obligation to satisfy these elements, (Doc. 33 at 15), only the last of which is challenged by the defendants.[4]

"When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, ... we require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006). *Burke-Fowler* invoked the "prior panel precedent" rule to select the "nearly identical" standard rather than the seemingly lower, "similar" standard articulated in some Eleventh Circuit opinions and proposed by the plaintiff here. *Id*. at 1323 n.2.[5] The plaintiff relies on two

---

an effort to influence the bonding and release of her son. The evidence was more evenly divided concerning the plaintiff's awareness of the directive but was more than strong enough to support the Board's finding — especially given her otherwise inexplicable resistance to being photographed in uniform by the bonding company and attempts to disguise her uniform in the picture. (Doc. 40, Exhibit 51 at 8).

[4]To establish a prima facie case, the discipline must be of sufficient magnitude to constitute an adverse employment action. *E.g., Burke-Fowler v. Orange County*, 447 F.2d 1319, 1322 (11th Cir. 2006). The defendants do not question that the plaintiff's ten-day suspension satisfies this element of her prima facie case.

[5]The *Burke-Fowler* Court traced the "nearly identical" standard to *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984). The same requirement can be found as early as 1982, when the old Fifth Circuit declared that the plaintiff's "burden ... was to establish that the misconduct for which she was discharged was nearly identical to that engaged in by a male employee whom [the defendant] retained." *Davin v. Delta Air Lines, Inc*., 668 F.2d 567, 570 (5th Cir. 1982). These pronouncements, especially in *Davin*, appear to be holding. Even if some lower standard in fact predates the "nearly identical" standard (and the plaintiff has not attempted to show this), *Burke-Fowler* resolved the intra-circuit conflict, and its ruling is binding on this Court.

comparators, neither of whom satisfies the "nearly identical" test.[6]

Marnita Coleman, an inmate work supervisor, was charged with disorderly conduct and resisting arrest in June 2004 and was thereafter convicted.  (Doc. 40, Exhibit 76).  When deputies responded to a domestic dispute involving Coleman's son and daughter-in-law, they instructed Coleman to stay away from the daughter-in-law.  Coleman initially complied but then returned to retrieve a house key, leading to a verbal altercation with her relative.  Coleman ignored several orders from a deputy to back away and was arrested for disorderly conduct.  She then tried to avoid being handcuffed and refused to enter the patrol car.  (*Id.*, Exhibit 81).  An Internal Affairs investigation concluded that Coleman had violated departmental rules governing conduct unbecoming an officer and engaging in unlawful conduct.  (*Id.*).

There are several critical differences between Coleman's situation and the plaintiff's.  First, while the plaintiff's conduct occurred in a public place, Coleman's occurred at and adjacent to her residence.  Second, while the plaintiff's conduct occurred while she was in uniform, Coleman was not in uniform.  Third, while the plaintiff's conduct was directed towards the sheriff of a neighboring county, Coleman's conduct was directed towards her daughter-in-law (disorderly conduct) and only incidentally at the arresting deputy (resisting arrest).  Fourth, while the plaintiff's conduct invoked her official position in an effort to attain a personal goal, Coleman's did not.  In the face of these glaring differences, the mere fact that both employees engaged in conduct unbecoming an officer cannot render them similarly situated under the governing "nearly identical" standard.

In May 2005, corrections officer Jonathan Lindsey was reprimanded for conduct unbecoming an officer.  Lindsey transported an inmate to a Mobile hospital and there used vulgar language and made unprofessional statements to a nurse he considered to be unprofessional in her handling of the inmate.  (Doc. 40, Exhibit 16).  Although a closer case than Coleman's, "the quantity and quality of [Lindsey's] misconduct [is not] nearly identical" to that of the plaintiff.  First, Lindsey's conduct was not directed towards a high-ranking official of a

---

[6]The plaintiff complains generally that no other employee has been suspended for violating the uniform directive.  (Doc. 33 at 17).  Absent a showing that any other employee has violated the directive, however, she lacks a comparator.

neighboring county but towards a civilian.  Second, Lindsey was not attempting to advance a private agenda but to safeguard the dignity of an inmate under his care.  Third, because Lindsey was on duty, he was not in violation of any rule governing the wearing of uniforms.

The "nearly identical" standard is stringent, and differences smaller than those present here have been held sufficient under this standard to preclude reliance on a proposed comparator. For example, in *Burke-Fowler* the plaintiff had casual conversation with an inmate and, after he was transferred to another facility, began a romantic relationship with him culminating in marriage.  The plaintiff was terminated for violating her employer's anti-fraternization policy, which forbade employees to "fraternize with[,] correspond, call or receive phone calls from inmates."  The Court held that other employees who had romantic relationships with inmates were not similarly situated because the relationships began before the inmates' incarceration. 447 F.3d at 1321-25.

Unable to establish a prima facie case under the "nearly identical" standard, the plaintiff resists its application.  She first complains that the test could lead to the absurd result of a comparator being ruled not similarly situated because his conduct, although objectively much more serious than that of a plaintiff, was — precisely because it was so much worse — not nearly identical to the less serious conduct of the plaintiff.  Thus, she says, the test should be one of "comparable seriousness."  (Doc. 33 at 16-17).   The plaintiff's hypothetical does suggest a curious result in certain situations, and it might persuade the Eleventh Circuit to clarify that the "nearly identical" standard restricts the range of comparators only on the low side.[7]  It does not, however, authorize this Court to ignore that standard, especially in a case such as this, where the plaintiff's conduct plainly is more serious than that of her comparators.

Next, the plaintiff suggests that she "may also satisfy the fourth element of the prima facie case by showing a differential application of work rules."  (Doc. 33 at 16).  This is not, however, an alternate means of establishing a prima facie case but merely an alternate way of

---

[7]The use of the term "comparable seriousness" in past Supreme Court and Eleventh Circuit cases may augur well for such a development.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973); *Anderson v. WBMG-42*, 253 F.3d 561, 565 n.2 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1563 (11th Cir. 1997); *Jones v. Gerwens*, 874 F.2d 1534, 1541 n.12 (11th Cir. 1989).

expressing the "similarly situated" requirement.  *See Lathem v. Department of Children and Youth Services*, 172 F.3d at 793 ("If two employees are not 'similarly situated,' the different application of workplace rules does not constitute illegal discrimination.").

Finally, the plaintiff argues that she can establish a prima facie case without reference to comparators by demonstrating that she did not actually commit the infractions made the basis of her discipline.  (Doc. 33 at 17).  The plaintiff relies for this proposition on *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989).  *Jones* reads in pertinent part as follows:

> Accordingly, we hold that, in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

*Id*. at 1540.  As the Eleventh Circuit has parsed this language, the phrase following the final comma applies to both subsections (a) and (b).  *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 n.6 (11th Cir.), *superseded in unrelated part*, 151 F.3d 1321 (11th Cir. 1998). Thus, "[w]e stress that, under the *Jones* formulation, no plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule.  The plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better."  *Id*.

Because the defendants have challenged the plaintiff's ability to establish a prima facie case and she has failed to identify any means of doing so, they are entitled to summary judgment as to this claim.

### B.  Retaliation.

"To establish a prima facie showing of retaliation under Title VII, the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events."  *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004).  The defendants challenge the plaintiff's ability to establish the third element.  (Doc. 33 at 18-19).

"To establish a causal connection, a plaintiff must show that the decision-maker[s] [were]

aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (internal quotes omitted). "For purposes of a prima facie case, 'close temporal proximity' may be sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'" *Id.*

The plaintiff has identified only two acts of alleged opposition to perceived race discrimination occurring before her suspension was announced on July 12, 2004: (1) her filing of a Title VII lawsuit in 1999, concluding with a motion to enforce settlement on October 3, 2003, (Doc. 40, Exhibit 57); and (2) her submission of an officer narrative form on February 18, 2004, (*id.*, Exhibit 71). (Doc. 38 at 5, 9-10). As the defendants point out, the five-month period between the plaintiff's narrative and her suspension is, as a matter of law, too long to support an inference of causation.[8] The nine months between the conclusion of the plaintiff's prior lawsuit and her suspension is thus necessarily too long as well.

The plaintiff does not counter the defendants' argument or articulate any alternative basis for meeting the causation requirement. Indeed, she does not address the retaliation prong of her discipline claim at all. What she does do is insinuate that she engaged in additional protected activity, but without providing any record evidence of the occurrence or timing of such activity. (Doc. 38 at 10). Such unsupported conclusions are patently insufficient to carry her burden.

Because the defendants have pointed out the plaintiff's inability to establish a prima facie case and she has failed to identify any means of doing so, they are entitled to summary judgment as to this claim.

## II. Compensation.

The plaintiff's only compensation claim concerns the assignment of overtime. On July 19, 2004, Bounds sent a memorandum to her four sergeants advising them that officers and staff

---

[8]*See Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004)("By itself, the three month period between [the protected expression and the adverse action] does not allow a reasonable inference of a causal relation between the protected expression and the adverse action."); *accord Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001)(gap of four months too long to constitute close temporal proximity).

suspended without pay after a disciplinary hearing would be ineligible for overtime for 90 days after returning to work, with subsequent overtime requiring Bounds' approval.  (Doc. 40, Exhibit 23).

### A.  Race Discrimination.

The defendants insist that the plaintiff experienced no adverse employment action because, after Hurricane Ivan struck in September 2004, the plaintiff was assigned overtime. (Doc. 41 at 8).  There is no question but that an exclusion from overtime opportunities constitutes an adverse employment action,[9] and the mere happenstance that a natural disaster causes the employer to prematurely rescind the exclusion cannot retroactively erase the adverse action for the two months the exclusion was in place.

Bounds' articulated reason for sending the memorandum is that, pursuant to a discussion with Haley or Turner, she understood that employees disciplined with time off without pay should not be able to recoup their losses by working overtime.  (Bounds Deposition at 50). Because the plaintiff does not assert that this reason is insufficient to meet the defendants' burden, she must demonstrate the existence of a genuine issue of material fact as to whether Bounds' reason is a pretext for unlawful discrimination.

The plaintiff insists that Bounds' directive is racially discriminatory, (Doc. 33 at 23), but she fails to explain how.  On its face, the memorandum applies to all uniformed and civilian employees under Bounds' authority, regardless of race, and the plaintiff has not suggested that it would not be applied to any white employee receiving time off without pay.  For all that appears, the memorandum was not issued earlier only because there was no employee as to whom it could be applied.  The mere fact that, at the moment it was issued, the memorandum captured only the plaintiff is not evidence that it was intended to discriminate against blacks.

As the plaintiff acknowledges, (Doc. 33 at 6), "[t]o show that the employer's reasons

---

[9]*Bass v. Board of County Commissioners*, 256 F.3d 1095, 1118 (11th Cir. 2001)("We conclude that the [defendant's] actions which deprived [the plaintiff] of compensation which he otherwise would have earned [including having "denied him the opportunity to earn overtime pay"] clearly constitute adverse employment actions for purposes of Title VII."); *accord Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002).

were pretextual, the plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Cooper v. Southern Co.*, 390 F.3d at 725.  The plaintiff having failed utterly to meet or even address this burden, the defendants are entitled to summary judgment as to this claim.

### B. Retaliation.

On July 14, 2004, the plaintiff prepared a document grieving her suspension.  (Doc. 40, Exhibit 72).  The memorandum is addressed to, inter alia, Bounds, and the defendants make no argument that she did not receive it on or shortly after July 14.  Bounds' overtime memorandum, dated only five days later, plainly satisfies the causation element of the plaintiff's prima facie case under the "close temporal proximity" test.

The grievance lists the plaintiff's objections to the procedures employed and identifies gaps in the evidence against her.  In the concluding paragraph, the plaintiff states that "I feel as if this was a discriminating act against [me].  I also feel as if this is retaliation against [me]."  (Doc. 40, Exhibit 72 at 2).  The defendants argue that this language does not constitute statutorily protected opposition but only the "invoking [of] magic words in an otherwise standard grievance."  (Doc. 33 at 7).  The defendants offer no authority or argument in support of their ipse dixit, and the Court will not supply the deficiency.

As noted, Bounds' articulated legitimate reason for issuing the memorandum was her understanding that employees disciplined with unpaid leave should not be allowed to recoup their losses by working overtime upon their return.  In her only effort to show pretext, the plaintiff stresses that Bounds' superiors had considered creating a departmental policy along the lines of her directive but had not done so.  (Doc. 38 at 23).  The only evidence, however, is that although her superiors did not implement a departmental policy, they had expressed to Bounds and other lieutenants their agreement with this philosophy, and they withheld establishing a mandatory, department-wide policy only because staffing shortages would have made it difficult to implement.  (Haley Deposition at 93, 95; Turner Deposition at 62-63, 66).  Bounds' adoption of this position for her employees was both consistent with her superiors' philosophy and within her authority, (Haley Deposition at 85-86, 94-95), and such policies are not uncommon in law

enforcement.  (Barlow Deposition at 37).  In short, there is no suspicious tension between Bounds' adoption of this policy for her employees and her superiors' failure to adopt the same policy for the department as a whole.

The plaintiff is thus left to base her retaliation claim exclusively on the timing of the memorandum in relation to her grievance.  However, "temporal proximity ... alone is not sufficient to establish pretext," *Spann v. DynCorp Technical Services, LLC*, 2006 WL 1667294 at *3 (11th Cir. 2006), at least "[w]here the employer produces significant evidence of the employee's poor performance" or other legitimate reason for the employment decision.  *Gamba v. City of Sunrise*, 157 Fed. Appx. 112, 113 (11th Cir. 2005)(FMLA case).  As noted above, Bounds' articulated reason is perfectly consistent with her superiors' known preference for preventing disciplined employees from making up lost earnings imposed as a sanction, with the approval of such policies within the law enforcement community generally, and with her authority to manage manpower needs within the barracks.  Given the strength of the defendants' uncontroverted evidence, close temporal proximity cannot create a jury issue as to pretext.

The correctness of this result is only underscored by the plaintiff's failure to offer any explanation why Bounds would desire to punish her for claiming that her suspension was motivated by discrimination or retaliation.  Bounds' only connection with the proceedings was to testify as to the publicity given the uniform directive, (Doc. 40, Exhibit 51 at 9-10), and the plaintiff's grievance expresses no dissatisfaction with Bounds' testimony or that of any other witness.  (*Id*., Exhibit 72).  Nor has the plaintiff argued or produced evidence that Bounds acted at the urging of Tillman, Haley, Turner or anyone else who might have had a retaliatory motive.

Because the plaintiff has not demonstrated the existence of a genuine issue of material fact as to pretext, the defendants are entitled to summary judgment as to this claim.

## III.  Service Rating.

On or about August 24, 2004, the plaintiff received an annual service rating of "unsatisfactory" from defendant Bounds.  (Turner Deposition, Exhibit 49).  The defendants admit that the unsatisfactory rating constituted an adverse employment action because it temporarily disqualified the plaintiff from promotion.  (Doc. 41 at 7).

### A.  Race Discrimination.

The defendant argues that the plaintiff cannot establish a prima facie case for want of a similarly situated comparator.  (Doc. 33 at 23).  The plaintiff acknowledges that she must identify such a comparator to survive summary judgment, (Doc. 38 at 5-6), and she attempts, unsuccessfully, to do so.

Bounds provided two reasons for giving the plaintiff an unsatisfactory rating: (1) that she "takes time off from work by calling in and requesting time off and has a pattern of reporting late for work"; and (2) her suspension.  (Doc. 40, Exhibit 34).  With respect to the former, the plaintiff asserts that "many officers [under Bounds' supervision] had as little or less leave than McCann."  (Doc. 38 at 19).  The documents on which she relies are not relevant to her point, since they reflect balances almost a year following the August 2004 rating.  (Doc. 40, Exhibit 64).

More fundamentally, the plaintiff's argument misconstrues Bounds' reason for the low service rating.  *Cf. Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004)("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.").  Bounds did not accuse the plaintiff of using too much leave, or of using more than she had accumulated; rather, Bounds faulted the plaintiff for her irresponsible manner of taking time off.  First, the plaintiff repeatedly sought time off remotely, by telephone, rather than by advance personal request.  Second, the plaintiff habitually reported for duty after her scheduled start time.  The plaintiff has not even attempted to identify another employee with similar issues who was not dealt with similarly.

With respect to Bounds' reliance on her suspension, the plaintiff identifies Andre King as having received a satisfactory service rating following a 30-day suspension.  (Doc. 38 at 21).  King, however, is black, (*id*.), and so is not a person outside the plaintiff's protected category.[10]  The plaintiff's only other comparator is Marnita Coleman.  (*Id*.).  Since she was not suspended, she cannot serve as a comparator to the plaintiff, who was.  Looking past the discipline imposed

_____

[10]Nor has the plaintiff, who has provided King's service rating reports for several years, (Doc. 40, Exhibit 78), identified any evidence for the proposition that King had been suspended during any of these review periods.

-13-

to the underlying conduct, and as discussed in Part I.A, Coleman is not similarly situated to the plaintiff.

The plaintiff's inability to identify a similarly situated comparator precludes her from establishing a prima facie case under the only formulation she or the defendants have urged upon the Court, and the defendants are entitled to summary judgment as to this claim.

### B. Retaliation.

The plaintiff's only statement in support of this claim is that her unsatisfactory service rating "was clearly an effort to punish [her] for being an outspoken advocate for herself and other victims of discrimination." (Doc. 38 at 21). As discussed in Part I.B, the plaintiff has provided no record evidence of any potentially protected expressions preceding her July 2004 suspension other than her prior lawsuit and her officer narrative form. The single additional expression that occurred between the suspension and the service rating was the plaintiff's grievance of her suspension. (Doc. 40, Exhibit 72).

The defendants first challenge the plaintiff's ability to establish the causation element of her prima facie case. (Doc. 33 at 23). As discussed in Part I.B, the prior lawsuit and the officer narrative form are too remote to support causation based on timing alone. The grievance, however, is dated July 14, 2004, six weeks before Bounds' August 24 service rating, and its identification of Bounds as a recipient constitutes evidence that Bounds received the grievance on or shortly after that date. The defendants have not argued otherwise. Nor have they identified any authority for the proposition that six weeks is too long a gap to satisfy the causation element, and Eleventh Circuit precedent suggests the contrary. *See Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999)(where the plaintiff was fired seven weeks after filing an EEOC charge and there was evidence the decision makers were aware of the charge "shortly after its filing," "this timeframe [was] sufficiently proximate to create a causal nexus for purposes of establishing a prima facie case").

The defendants' articulated reasons for the plaintiff's service rating are those reflected in the document itself: the plaintiff's unorthodox manner of requesting leave, her chronic tardiness, and her suspension. (Doc. 33 at 23; Doc. 41 at 7). Because the plaintiff does not challenge these reasons as insufficient to carry the defendants' intermediate burden, she is required to create a

-14-

genuine issue of material fact as to whether the defendants' proffered reasons are a pretext for unlawful retaliation.

The plaintiff presents the following arguments in favor of pretext: (1) she has received uniformly satisfactory ratings except this one; (2) other employees under Bounds' supervision had lower leave balances; (3) her suspension did not affect how she performed her job; (4) other employees think highly of her abilities; (5) her immediate supervisor, Sergeant Taylor, apologized for the low rating; (6) Bounds engaged in other conduct suggestive of retaliation; and (7) Tillman has a pattern of retaliating against employees who oppose unlawful discrimination. (Doc. 38 at 19-24, 31-32). The Court reviews these items below, but only after noting that the plaintiff, by failing to argue otherwise, concedes for purposes of this motion that she did indeed, during the rating period ending July 17, 2004, have the leave and tardiness issues attributed to her by Bounds.

The satisfactory ratings of previous supervisors can be of no consequence without a showing that, when under their supervision, the plaintiff had leave and tardiness issues similar to those noted by Bounds. The plaintiff does not even suggest that this is the case. Even had she done so, "differences in the evaluation of [a plaintiff's] performance do not raise a genuine issue as to pretext [because] [d]ifferent supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important." *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002); *cf. Silvera v. Orange County School Board*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001)("[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination."). And if the opinions of former supervisors as to the plaintiff's performance cannot show pretext, certainly the opinions of co-workers cannot do so — especially when, as here, they do not address the plaintiff's leave and tardiness issues.

As discussed in Part III.A, the plaintiff's evidence of comparative leave balances comes from an irrelevant time period and moreover misses the point, since she was not rated poorly because of her low balances.

Bounds' testimony that the plaintiff's suspension did not "have anything to do with ... the way she performs her job," (Doc. 40, Exhibit 6 at 77-78), is not suspicious, because the plaintiff has identified no evidence that such matters cannot be considered in assigning a service rating.

The plaintiff relies on her deposition testimony and that of a corporal to relate what Taylor told them she thought about the plaintiff's service rating.  (Doc. 38 at 20).  The defendants have objected to this evidence as hearsay, (Doc. 41 at 7), and the plaintiff has done nothing to refute this facially meritorious objection.  "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment," *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999), and the plaintiff has not offered to explain why her evidence is not captured by the general rule.[11]  At any rate, Taylor's apology for the plaintiff's low service rating is, like the opinions of previous supervisors and current co-workers, of little import, since different supervisors may have different views as to what makes a good employee.

The plaintiff identifies several respects in which she has been treated unfairly by Bounds, beginning with Bounds' memorandum concerning overtime work.  As discussed in Part II, the plaintiff cannot establish a prima facie case that the memorandum was either racially discriminatory or retaliatory.  It thus cannot assist the plaintiff in showing pretext.

Next, the plaintiff complains that, when her daughter graduated from high school, Bounds required her to use sick leave rather than comp time to attend.  (Doc. 38 at 21-22).  It is difficult to discern how this requirement could furnish evidence that Bounds' August 2004 service rating of the plaintiff was in retaliation for her expression of opposition to unlawful employment practices in her July 2004 grievance, especially since: (a) the requirement was not directed just to the plaintiff but applied to everyone, (Doc. 40, Exhibit 1 at 104-05);[12] (b) the plaintiff identifies no protected activity as to which Bounds could have been retaliating by imposing the requirement; (c) it was imposed in 2003, (*id*. at 36), long before the events at issue herein; and (d) the plaintiff has provided no evidence that the use of comp time rather than sick

---

[11]The defendants have represented, without challenge from the plaintiff, that Taylor in sworn testimony has denied making these statements or disagreeing with the plaintiff's rating. (Doc. 41 at 7).

[12]The plaintiff's statement in brief that "[n]o other person was required to use sick leave to attend their daughter's graduation," (Doc. 38 at 22), is unaccompanied by any citation to the record.

leave damaged or even inconvenienced her.[13]

In a related vein, the plaintiff notes that, at some unspecified time in the past, Bounds required that all of the plaintiff's requests for time off be approved in advance by Bounds, even when Bounds was off duty.  (Doc. 38 at 22).  The plaintiff does not explain how this requirement suggests that Bounds retaliated against her in August 2004, and her own evidence reflects that another employee — who is not alleged to have engaged in protected activity — was subject to the same requirement.  (Doc. 40, Exhibit 6 at 162-63).  If anything, the requirement corroborates Bounds' articulated reason by showing that Bounds took the plaintiff's leave problems seriously.

The plaintiff's objection that Bounds required her to have a doctor's excuse for all absences, and that Bounds had Turner visit a doctor's office to confirm an excuse she provided, (Doc. 38 at 22-23), is subject to similar observations.  The incident occurred in or after August 2005, (Doc. 38 at 23; Doc. 40, Exhibit 73), a year or more after Bounds' alleged retaliatory service rating, and so is remote in time.  Moreover, both the requirement of a medical excuse and Turner's visit to check compliance are consistent with Bounds' articulated reason for the service rating and underscore how seriously Bounds took the plaintiff's leave issues.  Finally, the plaintiff's evidence reflects that Turner's investigation was prompted by the circumstances of the plaintiff's leave, which would naturally stir suspicion of an employee with a history of gaming the system:  an anomaly in the doctor's signature and the timing of the doctor's visit (Mardi Gras Day, which employees had been forbidden to take off).  (Doc. 40, Exhibit 5 at 82-84, 86).

Buried in an unrelated portion of her brief, the plaintiff asserts that she was thrice nominated for officer of the month but that Bounds "never approved her nominations" and required one of them to be resubmitted.  (Doc. 38 at 27).  The plaintiff's cited evidence confirms she was nominated three times and that Bounds required one nominee to resubmit his nomination because he had given it to the wrong person, (Doc. 40, Exhibit 19 at 12-14, Exhibits 20-21, 69), but it does not support the proposition that Bounds refused to approve or forward the nominations.  At any rate, none of the nominations is dated earlier than December 27, 2004, and

---

[13]The plaintiff concedes her pay was not affected by the requirement.  (Doc. 38 at 22).  She asserts that excessive use of sick leave hurts an employee's chances of promotion and that Bounds criticized her for using excessive sick leave, (*id.*), but she cites no record evidence that supports either proposition.

Bounds' earliest demonstrated contact with any of them occurred in January 2005, (*id.*, Exhibit 19 at 12, Exhibit 20), almost five months after the unsatisfactory service rating.

Finally, Tillman's alleged pattern of retaliating against employees who resisted race discrimination is irrelevant, given the utter lack of evidence that he had anything whatsoever to do with Bounds' assignment of a service rating.

In short, the plaintiff has failed to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Cooper v. Southern Co.*, 390 F.3d at 725. The defendants are thus entitled to summary judgment as to this claim.

## IV. Promotion - 2004.

The plaintiff desires promotion from corrections officer to corrections corporal. On March 22 and May 8, 2004, two officers (Dan King and Davette Cobb, respectively) were promoted to corporal. The plaintiff complains that she should have been awarded one of these positions. (Doc. 38 at 25).

### A. Race Discrimination.

"[T]o establish a prima facie case of discriminatory failure to promote, a plaintiff must prove: ... (4) that other equally or less qualified employees who were not members of the protected class were promoted." *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001) (internal quotes omitted). As the defendants note, (Doc. 33 at 22), the two individuals who received promotion are black. The plaintiff acknowledges this inconvenient fact but suggests it should not affect her ability to prove a prima facie case because all the eligible candidates for promotion were black. (Doc. 38 at 3, 25). The plaintiff's argument is not only unsupported by authority or analysis, it is negated by her admission that she must prove that the successful candidates were not black. (*Id.* at 5-6).

### B. Retaliation.

As noted in Part I.B, the only allegedly protected activities preceding June 2004 of which

-18-

there is record evidence are the plaintiff's previous Title VII lawsuit and her February 18, 2004 officer narrative form. As discussed in that section, the lawsuit as a matter of law is too remote to satisfy the plaintiff's burden of showing a causal relation between her protected activity and an adverse employment action occurring more than three months later. That leaves the plaintiff to rely on her narrative.

The narrative states that Bounds asked the plaintiff if she had passed anything from a certain inmate to another inmate who happens to be the plaintiff's brother; that the plaintiff responded she had, but only books as she understood was allowed; and that someone ordered her brother moved from the barracks to the jail. The narrative expresses the plaintiff's opinion that the move was unfair, because her brother was a good inmate and because other inmates that are moved are transferred to the third floor. (Doc. 40, Exhibit 71). The narrative concludes as follows: "I just complaint [sic] last week to Sgt. Taylor and Lt. Bounds that I felt as if I was being mistreated. I know this is about me (McCann) not Christopher Hurd. I am writing this as a complaint of harrassing [sic] toward C/O McCann." (*Id*.).

The defendants argue that the plaintiff cannot rely on the narrative because "[n]othing in [it] indicates that she is complaining of racial discrimination or retaliation for protected activity." (Doc. 41 at 6). As in Part II.B, the defendants offer no analysis or authority to support the proposition that the plaintiff's objection to "harass[ment]" is insufficient as a matter of law to invoke the opposition clause. As the defendants advance no other challenge to the plaintiff's prima facie case, the Court must, for purposes of this motion, treat the plaintiff's burden as satisfied and consider the defendants' articulated legitimate, nondiscriminatory reason for not selecting the plaintiff for promotion.

The defendants identify their reason for promoting King and Cobb ahead of the plaintiff as that they "were better qualified and more suited to the position" than she. (Doc. 33 at 22-23). As the plaintiff does not challenge the capacity of this reason to carry the defendants' intermediate burden, the Court turns to her evidence of pretext. This is primarily of two types: (1) the defendants' inability to identify any superior qualifications of King and Cobb; and (2) the defendants' failure to follow their usual procedures in making these promotion decisions. (Doc.

38 at 25-26).[14]

In assessing pretext when the employer relies on relative qualifications, the key issue is not whether the successful candidate is in fact better qualified but whether the employer *believed* the successful candidate to be better qualified.  Thus, for example, a plaintiff can support pretext by showing that her qualifications are so much greater than those of the successful candidate as to allow the jury to conclude that the employer did not truly believe the successful candidate was better qualified.  *E.g., Wilson v. B/E Aerospace, Inc*., 376 F.3d 1079, 1090-91 (11th Cir. 2004).

Here, the plaintiff notes that, while the defendants insist that King and Cobb were more qualified for promotion than the plaintiff, neither Haley nor Turner — both of whom recommended King and Cobb for promotion — can identify a single qualification that the successful candidates possessed but that she lacked.  (Doc. 38 at 26; Doc. 40, Exhibit 5 at 23-26; Haley Deposition at 28-30).  This inability to identify any superior qualification of King and Cobb supports a reasonable inference that the defendants did not truly believe that King and Cobb were better qualified.  Because the jury could conclude that the defendants did not believe the plaintiff to be less qualified, it could conclude that their articulated reason for the promotion decisions is false; *i.e*., that it is not the actual reason for the decisions.  *E.g., Wilson v. B/E Aerospace*, 376 F.3d at 1091.

"Proof that the defendant's explanation is unworthy of credence ... may be quite persuasive" evidence of discriminatory intent, both because the jury is entitled to consider a party's dishonesty as evidence of guilt and because, since the employer is in the best position to articulate its actual reason, eliminating the articulated reason often leaves discrimination as the most likely alternative.  *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 147 (2000).  Thus, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Id*. at 148.  *Reeves* supplants the pre-existing Eleventh

---

[14]Although she also notes that she was ranked ahead of King and Cobb on the lists sent by the Board, (*id*. at 26), the Court does not assign any weight to this assertion in its analysis, because the plaintiff has not attempted to show that the candidates' rankings (the plaintiff fifth, King eighth, and Cobb ninth (McCann Deposition Exhibits 12-13)), reflect a meaningful disparity in qualifications as assessed by the Board.

Circuit rule that a plaintiff must always survive summary judgment if he "presents a prima facie case as well as plausible evidence that would permit a jury to disbelieve the employer's stated legitimate, nondiscriminatory reasons." *Bogle v. Orange County Board of County Commissioners*, 162 F.3d 653, 658 n.6 (11th Cir. 1998). Even after *Reeves*, however, "in the *usual* case, rejection of the reasons offered by the defendant, combined with the evidence supporting the prima facie case, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1185-86 (11th Cir. 2005)(emphasis in original)(internal quotes omitted).

The defendants do not argue that this is the unusual case in which the plaintiff's prima facie case, plus her evidence that the defendants proffered a false reason for the alleged action, is insufficient to defeat summary judgment, and the Court will not undertake such a subtle inquiry unilaterally on their behalf. At any rate, there is additional evidence of pretext in this case. There is evidence that the regular practice for selecting among candidates for promotion to corrections corporal was to convene a panel of Turner, Captain Omar Smith, Lieutenant Ester Lynn Mitchell, and sometime Haley. The makeup of each panel was determined by Haley. The panel would interview all the candidates on the list sent by the Board and recommend one candidate to Tillman for promotion. (Turner Deposition at 120; Haley Deposition at 23; Doc. 40, Exhibit 8 at 8). There is also evidence that, with respect to the promotions of King and Cobb, Smith was not on the panels. (Doc. 40, Exhibit 8 at 11-12).[15] Finally, there is evidence that Smith was impressed with the plaintiff when he served as her lieutenant. (Doc. 40, Exhibit 1 at 24-25; *id.*, Exhibits 35-36, 38, 41). "An employer's violation of its own normal [promotion] procedure may be evidence of pretext,"[16] and a reasonable inference from this evidence — to

---

[15]Smith testified that he does not recall sitting on either panel. (*Id.*). Although he previously testified that he did sit on the King panel, (*id.* at 9), he then doubted his memory because he "never interviewed" the plaintiff, as he would have had he sat on the King or Cobb panels. (*Id.* at 12). On motion for summary judgment, of course, the Court must accept the version most favorable to the plaintiff.

[16]*Bass v. Board of County Commissioners*, 256 F.3d 1095, 1108 (11th Cir. 2001); *accord Walker v. Prudential Property & Casualty Insurance Co.*, 286 F.3d 1270, 1279 (11th Cir. 2002) ("The bending of established rules may, of course, be suggestive of discrimination.").

which the defendants have not responded — is that they ignored their normal selection procedures in an effort to decrease the chances that the plaintiff would be recommended for promotion.

"Whether judgment as a matter of law is appropriate in any given case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves v. Sanderson Plumbing Products*, 530 U.S. at 148. The prima facie case stands for present purposes as established, the probative value of the defendants' inability to identify a single respect in which the plaintiff trailed the successful candidates is strong, the defendants have pointed to no evidence supporting their case, and the evidence that they manipulated the selection process to exclude the plaintiff further suggests a retaliatory motive.

### C.  Individual Defenses.

#### 1.  Bounds.

Even the plaintiff's evidence establishes that Bounds had no connection with the promotion decisions. It is not clear that the plaintiff intends to sue Bounds under this claim, but it is perfectly clear that she cannot do so.

#### 2.  Tillman.

The defendants argue that Tillman was unaware of any protected activity by the plaintiff and that this defeats her ability to establish a Title VII claim against him as agent of the employer. (Doc. 41 at 5). In the first place, the defendants have failed to submit the deposition page on which they rely for the proposition that Tillman was ignorant of the plaintiff's protected activities. More fundamentally, Tillman's lack of retaliatory motive, if shown, would not of itself preclude Title VII liability, because "[d]isparate treatment analysis requires that none of the participants in the decision-making process be influenced by [retaliatory] bias." *Jones v. Gerwens*, 874 F.2d at 1541 n.13. In particular, "[i]f the Chief were not motivated by [retaliatory] animus but [Haley or Turner], his subordinate[s], were consciously recommending [others for promotion in retaliation against the plaintiff], the Chief's neutrality with respect to [retaliation]

would not cure [Haley and Turner's] [retaliatory] bias ...."  *Id.*; *accord Anderson v. WBMG-42*, 253 F.3d 561, 566 (11th Cir. 2001).

### 3.  Haley and Turner.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

"[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority."  *Harbert International, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).  The burden then shifts to the plaintiff to show that the individual defendants' conduct "violated a clearly established statutory or constitutional right."  *E.g., Grayden v. Rhodes*, 345 F.3d 1225, 1231 (11th Cir. 2003).  The inquiry may be broken down into two parts: (1) whether the evidence, if believed, would establish a violation of the plaintiff's rights; and (2) whether those rights were clearly established at the time of the alleged deprivation.  *E.g., id.*

Although the defendants have not attempted to prove that Haley and Turner were acting within their discretionary authority in recommending King and Cobb for promotion, the Court will assume for present purposes that they were so acting.

"Section 1983 ... does not create any substantive federal rights. ...  Therefore, the plaintiff must point to a specific federal right that the defendant violated."  *Williams v. Board of Regents*, 441 F.3d 1287, 1301 (11th Cir. 2006)(citation omitted).  The sorts of rights that can be vindicated through Section 1983 are limited to those "secured by the Constitution and laws."  42 U.S.C. § 1983.  The complaint identifies no constitutional rights the plaintiff is addressing through Section 1983, (Doc. 1), so she can be vindicating only statutory rights.  The only statutes she identifies in her complaint are Title VII and Section 1981.  Rights under Title VII cannot be upheld under Section 1983, but those provided by Section 1981 can be.[17]  Accordingly, the

---

[17]*Compare Arrington v. Cobb County*, 139 F.3d 865, 872 (11th Cir. 1998)("Of course, an allegation of a Title VII violation cannot provide the sole basis for a § 1983 claim.") *with Butts v.*

plaintiff's Section 1983 claim is brought exclusively in order to vindicate rights under Section 1981.

"*Andrews* [*v. Lakeshore Rehabilitation Hospital*, 140 F.3d 1405 (11th Cir. 1998)] does establish that § 1981 encompasses a cause of action for retaliation.  This cause of action includes retaliation for a plaintiff's opposition to race discrimination, whether or not he personally is the victim of that race discrimination." *Tucker v. Talladega City Schools*, 171 Fed. Appx. 289, 295 (11th Cir. 2006).  As *Andrews* was decided in 1998, the proposition that it is unlawful under Section 1981 to retaliate against an employee for complaining of race discrimination was clearly established when Haley and Turner acted in early 2004.  As discussed in Part IV.B, the evidence if believed would establish a violation of this right.  The defendants do not argue otherwise.

Indeed, the defendants offer no qualified immunity argument of any sort specifically directed to this claim.  The Court, however, assumes that the defendants intend to invoke certain propositions asserted generally elsewhere in their briefing, viz: (1) they did not violate the plaintiff's rights under Section 1981; (2) they were not involved in the adverse job action; and (3) their actions were taken for legitimate, nondiscriminatory reasons.  (Doc. 33 at 3-4).  The Court responds as follows: (1) the plaintiff has a right under Section 1981 not to be retaliated against for opposing race discrimination and, as discussed in Part IV.B and this section, there is a jury question presented as to whether she was so retaliated against; (2) by the defendants' own evidence, they were involved in the decision not to promote the plaintiff; and (3) as discussed in Part IV.B and this section, there is a jury question presented as to the actual reasons for the defendants' actions.

Without attempting to tie it in to this case or claim, the defendants note that, even when there is evidence a defendant acted with an unlawful motive, he is still entitled to qualified immunity if "the record indisputably establishes that the defendant in fact was motivated, *at least in part*, by lawful considerations."  *Stanley v. City of Dalton*, 219 F.3d 1280, 2196 (11th Cir. 2000)(emphasis in original).  (Doc. 33 at 9-10).  The trouble is that the record does not indisputably establish that Haley and Turner were in fact motivated at all by lawful

---

*County of Volusia*, 222 F.3d 891, 892 (11th Cir. 2000)("[Section] 1983 contains the sole cause of action against state actors for violations of § 1981.").

considerations.  The single lawful reason they have given for their promotion recommendations is that they believed King and Cobb were better qualified than the plaintiff, and that bald assertion has been so undermined by their inability to name a single respect in which the plaintiff was less qualified (and by the unexplained irregularity of excluding a supporter of the plaintiff from the panel) that a jury would be entitled to find that they did not really base their decision on relative qualifications but on retaliation.  *See Bogle v. McClure*, 332 F.3d 1347, 1356 (11th Cir. 2003)(where the defendants offered a single race-neutral reason for their action, the plaintiff's evidence that the reason was a sham designed to disguise the defendants' racial motivation precluded qualified immunity).

### 4. Tillman, Haley and Turner.

The defendants argue that the official-capacity claims against Tillman, Haley and Turner should be dismissed pursuant to the sovereign immunity reflected in the Eleventh Amendment. (Doc. 33 at 7-8).  That immunity, however, has no application to appropriate prospective equitable relief, *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 102-03 (1984), and the complaint prays for just such relief.  (Doc. 1 at 6).

## V.  Promotion - 2005.

The parties agree that the unsatisfactory service rating the plaintiff received in August 2004 rendered her ineligible for promotion.  (Doc. 38 at 26; Doc. 41 at 9).  The plaintiff argues without amplification that, if the service rating and/or the suspension on which it was partially based were the result of race discrimination or retaliation, then "[a]ll promotions since [her] suspension are in question."  (Doc. 38 at 26).  While insisting that there have been "numerous" promotions to corrections corporal since her suspension, (*id.*), she identifies none.  The Court therefore confines its review to the two promotions identified by the defendants: those of Anisa Pope and Baron Hayes, both of which occurred on July 30, 2005.  (Doc. 33 at 22; McCann Deposition, Exhibit 7).

**A. Race Discrimination.**

Both Pope and Hayes are black.  (Doc. 33 at 22).  As noted in Part IV.A, this fact is fatal to the plaintiff's prima facie case.

**B. Retaliation.**

The plaintiff does not allege that the failure to promote her was independently retaliatory but argues instead that the retaliatory nature of her suspension and/or service rating caused her to be disqualified for consideration for promotion.  Because, as discussed in Parts I.B and III.B, the plaintiff has failed to create a jury issue as to retaliation concerning either her suspension or her service rating, she has necessarily failed to support any claim that retaliation in those decisions deprived her of promotional opportunities.

**VI. Shift Assignment.**

Sometime in 2003, Bounds moved the plaintiff from the day shift to the evening shift. (McCann Deposition at 87; Doc. 40, Exhibit 22).

**A. Race Discrimination.**

The defendants focus their attention on the requirement of an adverse employment action. (Doc. 33 at 24).  "We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment.  Moreover, ... the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)(emphasis in original).

The Supreme Court recently held that Title VII's anti-retaliation provision applies only when "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe Railway Co. v. White*,

2006 WL 1698953 at *10 (2006).[18]  *White* echoes *Davis* by requiring a materially adverse change as viewed by a reasonable worker.  By declaring that "the significance of any given act of retaliation will often depend upon the particular circumstances," *id*. at 11, it also parallels *Davis*'s call to review "the circumstances."

To illustrate the importance of the circumstances, the *White* Court noted that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children."  2006 WL 1698953 at *11.  That is, a shift change does not automatically constitute an adverse employment action for retaliation purposes under *White*, but can do so only if the plaintiff shows circumstances making the shift change materially adverse to a reasonable person operating in such circumstances.  After *Davis*, no more lenient rule can apply in the discrimination context.

In brief, the plaintiff asserts that "[a] nighttime shift worked a hardship on McCann, who has a special needs daughter."  (Doc. 38 at 27).  The plaintiff, however, has identified no evidence that working 3 p.m. to 11 p.m. rather than 7 a.m. to 3 p.m. made any difference in her care for her daughter.  On the contrary, the evidence is that the plaintiff's daughter, who has heart problems and is deaf, graduated from high school in 2003, (McCann Deposition at 36), the same year the plaintiff's shift was changed.  Without proof of circumstances that render a shift change materially adverse, the plaintiff has failed to satisfy the adverse-employment-action element of her prima facie case.[19]

---

[18]The Supreme Court presumably used "charge" in the broad sense of an accusation, rather than in the narrow sense of a formal charge of discrimination with the EEOC, since the facts in *White* involved only an internal complaint.  *Id*. at *3.

[19]*Davis* may draw a tighter circle for adverse employment actions in the discrimination context than *White* does in the retaliation context, since *Davis* requires that the action be not only material but also "serious."  Because the plaintiff cannot satisfy the *White* standard, the Court need not decide whether a shift change can never be "serious" under *Davis*.  *See generally Allen v. United States Postmaster General*, 158 Fed. Appx. 240, 244 (11th Cir. 2005)(a shift change does not represent an adverse employment action for purposes of a retaliation claim under the Rehabilitation Act).

### B.  Retaliation.

In the retaliation context after *White*, the plaintiff can show materiality by showing that the employer's action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  2006 WL 1698953 at *10.  In making that determination, "[c]ontext matters," requiring a review of the plaintiff-specific circumstances.  *Id*. at *11.  Because, as discussed in Part VI.A, the plaintiff has failed to provide evidence of any circumstances she operated under that might cause a reasonable employee to avoid complaining of unlawful discrimination in order to avoid a transfer to the evening shift, she cannot satisfy the adverse-action element of her prima facie case.

### VII.  Failure to Transfer.

The plaintiff asserts in brief that she has made "numerous" requests to transfer away from Bounds and that Bounds has denied every request.  (Doc. 38 at 26).  The only evidence cited by the plaintiff relates to a request for transfer dated October 6, 2003 and denied by Bounds three days later.  (Doc. 40, Exhibit 46).  The Court's consideration is thus limited to that single incident.

### A.  Race Discrimination.

The defendants again challenge the plaintiff's ability to establish an adverse employment action.  (Doc. 33 at 24).  A transfer can be an adverse employment action if the new position carries lesser pay, prestige or responsibility, and "[t]he flip side of this coin would appear to be that a failure to transfer may constitute an adverse employment action if [the new position] entails an increase in pay, prestige or responsibility."  *Morris v. Wallace Community College*, 125 F. Supp. 2d 1315, 1328 (S.D. Ala. 2001); *accord Gaddis v. Russell Corp*., 242 F. Supp. 2d 1123, 1145 (M.D. Ala. 2003).

The plaintiff's October 2003 request sought transfer from the barracks to the Metro jail. (Doc. 40, Exhibit 46).  The plaintiff does not even allege that working in the Metro jail as a correctional officer carried heightened pay, prestige or responsibility as compared with working in the barracks as a correctional officer.  Instead, she asserts that she simply wanted to "transfer from under the supervision of Lt. Bounds."  (Doc. 38 at 26).  The plaintiff offers no authority for

the proposition that a desire for a different supervisor transforms a failure to obtain transfer into an adverse employment action.  Even if a failure to transfer could be considered objectively "serious and material" when the supervisor has unlawfully discriminated or retaliated against the employee, as discussed in this opinion the plaintiff has failed to create a jury issue as to race discrimination or retaliation by Bounds at any time,  much less prior to October 2003.

### B.  Retaliation.

As noted in Part VI, the inquiry is whether the plaintiff's circumstances in October 2003 were such that a reasonable employee in those circumstances might withhold a complaint of discrimination rather than risk being denied a lateral transfer to another location.  The plaintiff has presented no evidence of circumstances concerning her relationship with Bounds that could allow this inquiry to be answered in the affirmative.  While she has submitted an October 2003 officer narrative form from a co-worker stating that she "is a disappointed and hurt officer who feel [sic] like she is being mistreated at the barracks," (Doc. 40, Exhibit 27), the issue is not how the plaintiff subjectively felt but the existence of underlying circumstances that could cause a reasonable employee to feel so mistreated by Bounds that she would consider not complaining of discrimination in order not to jeopardize a transfer to another supervisor.  The plaintiff has failed to address this issue, and the omission is fatal to her ability to establish the adverse action predicate to her prima facie case.

## VIII.  Hostile Work Environment.

"This court has repeatedly instructed that a plaintiff wishing to establish a hostile work environment claim show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability."  *Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1275 (11th Cir. 2002).

The fourth element, on which the defendants' argument focuses, "contains both an

objective and a subjective element."  *Miller v. Kenworth*, 277 F.3d at 1276.  "In evaluating the objective severity of the harassment, we consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  *Id*.

The plaintiff identifies four areas in which she has been subjected to a hostile working environment: (1) white employees make racially derogatory comments about blacks; (2) black employees are subjected to harsher discipline than whites; (3) employees complaining of discrimination are retaliated against; and (4) complaints of discrimination are not investigated. (Doc. 38 at 28-31).

The plaintiff relies on evidence that Bounds called her a "girl" and that Bounds called two black male employees "boys."  (Doc. 38 at 29; Doc. 40, Exhibit 1 at 46-49).  The plaintiff's evidence reflects that Bounds used the term once to each employee, for a total of three incidents. (*Id*.).  These are the only racially insensitive remarks the plaintiff heard by her supervisors from 2001 through 2005.  (*Id*. at 49).

The plaintiff also relies on evidence that, in or before 2003, Tillman referred to a former black female employee as a "nigger bitch" and stated he had never received the "nigger vote" and didn't want it.  (Doc. 40, Exhibit 60).  There is no indication that either statement was made more than once, for a total of two incidents.  It is clear that Tillman did not make the remarks to the plaintiff or in her presence, (McCann Deposition at 225), and the plaintiff offers no evidence that she (as opposed to her lawyer) has heard these statements even now.  Nevertheless, the Court will assume for present purposes that at some point in or after 2003 she became aware of the statements.

These are the only racial comments on which the plaintiff relies.  The remainder of her allegations and evidence concern alleged patterns of discrimination practiced against black employees.  The plaintiff has cited, and the Court can find, no authority for the proposition that such matters can be considered in evaluating the existence of a racially hostile work environment.  On the contrary, "[w]hen the workplace is permeated with discriminatory *intimidation, ridicule, and insult*, that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."

-30-

*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)(emphasis added) (internal quotes omitted).  That one of the factors employed to determine if a hostile work environment exists is "whether [the conduct] is physically threatening or humiliating, or a mere offensive utterance," *Harris v. Forklift Systems, Inc*., 511 U.S. 17, 23 (1993), echoes this limitation.

The *Morgan* Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  536 U.S. at 113.  That is, discrete discriminatory acts must be challenged as separate statutory violations and not lumped together under the rubric of hostile work environment.  The plaintiff, who describes her 1998 termination (which formed the basis of her 1999 lawsuit) as contributing to her hostile work environment, (Doc. 38 at 29), is in direct violation of this principle.  The same is true of the plaintiff's reliance on discrete acts of retaliation and discriminatory discipline committed against other employees.  (*Id*. at 29-31).  Whatever use the plaintiff might have made of these incidents had she brought a pattern-and-practice claim, she cannot employ them to cobble together a claim of hostile work environment.

The plaintiff's hostile work environment claim, therefore, is limited to three instances of racially insensitive language and two instances of a racial epithet, spread over a period exceeding two years.[20]  The plaintiff has offered no evidence that this language interfered with her work performance.[21]  The defendants argue that the plaintiff cannot show that this conduct was objectively severe or pervasive enough to alter the terms and conditions of her employment.  (Doc. 33 at 26-27).

In *Barrow v. Georgia Pacific Corp*., 144 Fed. Appx. 54 (11th Cir. 2005), the Court held that one plaintiff's evidence was too isolated and sporadic to be sufficiently severe or pervasive to alter the terms and conditions of his employment, even though part of the plaintiff's evidence

---

[20]The plaintiff worked under Bounds from June 2003 to September 2005.  (Doc. 39 at 2, ¶ 6; Doc. 40, Exhibit 77).

[21]Her only testimony on this point is directed to the totality of all the myriad aspects of her job that displeased her, and even then she insisted that she performed her job duties in a manner that was above satisfactory.  (McCann Deposition at 127).

was that his supervisor called him a "nigger" three times within the space of a year. *Id.* at 57. The plaintiff here has never had that epithet directed to her or spoken in her presence, and she has heard of its use no more than twice. She has also heard the term "boy" used once and heard of it being used a second time. The only term directed to the plaintiff is "girl," which was used once. These five incidents are spread over a time period twice the length of that in *Barrow*. The evidence in this case cannot be meaningfully distinguished from that in *Barrow*, which evidence was held insufficient as a matter of law to support a hostile work environment claim. *Cf. Mahgoub v. Miami Dade Community College*, 2006 WL 952278 at *1 (11th Cir. 2006)(four incidents of offensive ethnic utterances over an unspecified period of time, with one accompanied by a threatening physical gesture, but which did not interfere with the plaintiff's work performance, were legally insufficient to support a hostile work environment claim).

## CONCLUSION

For the reasons set forth above, the defendants' motions for summary judgment are **denied** with respect to the plaintiff's claim that she was denied promotions in March and May 2004 on the basis of retaliation. This claim will proceed with respect to all defendants other than Bounds. In all other respects, the defendants' motions for summary judgment are **granted**.

DONE and ORDERED this 6th day of July, 2006.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

-32-